J. S37045/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| KEVIN ESTERLY, | : | No. 153 EDA 2019 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered December 10, 2018,
in the Court of Common Pleas of Lehigh County
Criminal Division at No. CP-39-CR-0001792-2018

BEFORE: BOWES, J., KUNSELMAN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED SEPTEMBER 23, 2019**

Kevin Esterly appeals from the December 10, 2018 judgment of

sentence entered in the Court of Common Pleas of Lehigh County after he

entered an open guilty plea to one count of corruption of minors.[1]  The trial

court imposed a term of imprisonment of 2½ to 5 years.  We affirm.

Appellant agreed with the following factual basis for the plea:

> [On February 9, 2018, M.L., the victim's mother,]
> reported that [the victim, born in December of 2001]
> had been signed out of school . . . earlier that day on

---

[1] 18 Pa.C.S.A. § 6301(a)(1)(i).

We note that the record reflects that in exchange for appellant's guilty plea, the Commonwealth withdrew the charges of interference with custody of children, 18 Pa.C.S.A. § 2904 (graded as a third-degree felony); and felony concealment of whereabouts of children, 18 Pa.C.S.A. § 2909 (graded as a third-degree felony).

the 9th by [appellant] who at the time I believe was 45 years old[2] and was not authorized to do that.

On February 15th at 21:30 hours Allentown Police responded to [M.L.'s] residence. While there[, appellant] and his wife Stacey were there. Both [appellant] and Stacey were advised by Allentown Police to stay away from the residence and to have no contact with [the victim].

On February 20th of 2018[, the victim] was interviewed forensically and during that interview disclosed that [appellant] had signed her out of school five to six times without her mother's knowledge or consent.

Police were able to check the school records and the records revealed that from November of 2017 to February of 2018[, appellant] had signed [the victim] out of school ten times without permission from her mother.

On March 5th of 2018 about 6:30 in the evening[, M.L.] reported that [the victim] was missing. She said that she had last seen [the victim] that morning around 7 o'clock, when she had dropped her off around the area of 15th and Allen for the school bus. [M.L.] reported that based on history she believed [the victim] to be with [appellant].

She also indicated that some money and jewelry were taken from her residence. She believed that [the victim] had taken those items.

Allentown Police made contact with [appellant's] wife, Stacey Esterly. Ms. Esterly reported that she last saw [appellant] about 6:00 a.m. on the morning of March 5th.

_____

2 We note that the record reflects that appellant was born in December of 1972. At all times relevant to the factual basis of the plea, appellant was 45 years old and the victim was 16 years old.

She indicated that $4,000 in their joint bank account had been withdrawn and that [appellant's] car was missing.

On March 6th the police were able to confirm that [appellant] did in fact withdraw $4,000 from their joint account at the Lehigh Valley Educator's credit union on Hamilton Boulevard.

Police were also able to confirm that no student saw [the victim] leave the school bus on the morning of the 5th.

On March 7th Stacey Esterly contacted Allentown Police to inform them that she had been calling various airlines asking if her husband had purchased any tickets. She was informed that on March 5th [appellant] had purchased a one way ticket from Philadelphia to Cancun, Mexico.

Allentown Police contacted Homeland Security with this information and Homeland Security was able to determine flight information for both [appellant and the victim], determined that they both purchased tickets on flights from Philadelphia to Cancun, Mexico.

Video surveillance from the hospital or from the airports [was] able to confirm that they were traveling together in Philadelphia and at Dallas/Forth Worth Airports, which was a stop on the way to Cancun.

At this point, . . . the initial complaint was filed and all efforts were made focusing on finding [the victim] and [appellant] in Mexico.

At this time police were doing everything they could . . . to try to locate [the victim] and [appellant]. They were checking e-mails, Snapchat logs, Netflix downloads.

Homeland Security had, in fact, reached out to authorities in Mexico and on March 15th Mexican authorities issued an AMBER Alert.

On March 16th a local cab driver in Mexico called in to claim to have driven both [the victim] and [appellant] to an apartment complex near Cancun.

On March 17th Homeland Security and Mexican police set up surveillance in the area described by the cab driver and around 11:45 they entered the residence and they recovered both [the victim] and [appellant].

While there Homeland Security had occasion to speak with [the victim]. [She] talked to Homeland Security. She indicated that she had always planned on leaving home. She told them that she had purchased the plane tickets for herself on her own.

She said that when [appellant] found out he purchased tickets for himself to accompany her.

She said that she came up with all the travel plans by herself. That on the morning of the 5th that instead of going to school she met [appellant] at the McDonald's parking lot and he . . . drove them to the Philadelphia Airport.

She said that she had pre-booked a hotel with a prepaid card and they stayed for a week at a hotel in Cancun.

She indicated that she left her cell phone in Allentown and brought a laptop with her. She indicated that before she took her laptop she wiped it, prior to leaving Allentown.

She said she knew the authorities were looking for her and once they were in Mexico[, she] and [appellant] moved their location around and, in fact, created aliases by the name of Jamie Cruz and Calvin Cruz.

When asked about their history[, the victim] said she has known [appellant] since she was nine years old. She had known him from church.

She indicated that she had a poor relationship with her mother. She viewed [appellant] as a father figure

to her. She said she spent a lot of time at the Esterly's home because she did not want to be with her mother. She emphatically denied any kind of sexual relationship with [appellant].

Homeland Security took [the victim] on a plane and flew her to the Philadelphia Airport where she was met by Detectives from Allentown Police.

While she was with Allentown Police she reiterated again what she told Homeland Security. Again she said she was planning to go to Mexico anyway; that [appellant] came along. Again, she denied any type of sexual relationship.

She inquired where Allentown Police were taking her. They told her she was going to be returned to her mother's house. [The victim] became very upset, indicated that she wasn't going home.

The Allentown Police drove her to her mother's house at which point she again indicated that she didn't want to go and at one point indicated that she would rather be dead.

At that point, when she said that, Allentown Police took her to St. Luke's because there was a concern that she might be a danger to herself.

Ultimately Children and Youth became involved and [the victim] was placed in a location that we are not going to disclose and she is currently there. Although we know from the media reports that at that location she did ultimately leave at one point in time on her own and was returned there.

Meanwhile, [appellant] was taken by Homeland Security to Miami, Florida and while he was there he waived extradition to Pennsylvania.

On March 24th Detective Hackman of [the] Allentown Police and Detective Ressler of [the district attorney's] office picked [appellant] up in Miami and flew him back to Pennsylvania.

Once back in Pennsylvania Detective Hackman brought [appellant] to headquarters and spent a number of hours speaking with him.

[Appellant] indicated that he knew [the victim] from church. He indicated that he didn't really get close with her until the summer of 2017.

He indicated that [M.L.] was having trouble controlling [the victim's] behavior. That [the victim] told him that her mother was physically abusive to her.

[The victim] began spending a lot of time at the Esterly residence in the summer of 2017. He acknowledged that in February of 2018 Allentown Police told him not to have any contact with [the victim].

[Appellant] acknowledged that he took [the victim] out of school. He said he did it to help her get things like her driver's permit.

[Appellant] said that he spoke to [the victim] on March 4th, that she told him she was leaving. [Appellant] acknowledged that he decided to go with her and met her at McDonald's on the morning of the 5th, drove her down to Philadelphia and flew with her to Dallas and eventually to Mexico where they got a hotel. [Appellant] denied any type of sexual contact with [the victim].

He acknowledged that he took $4,000 from his account at the Credit Union but indicated that it was his money. And [the Commonwealth] did, in fact, confirm that it was a joint account.

He acknowledged that in Mexico he and [the victim] got aliases, moved around to avoid detection, and that while in Mexico he made no effort to inform anybody about [the victim's] location or even if she was okay.

On March 28th Detective Murray from Allentown Police again went to visit and speak with [the victim]. Again,

she reiterated that she was planning to go to Mexico on her own, that she told [appellant] about it, and that she said she was going anyway at which point he said he would go with her. Again, she denied any type of sexual relationship.

She said that she put [appellant] on her emergency contact at school because she believed her mother didn't care about her. She said he took her out of school for things like her driver's permit, doctor's appointments and soccer.

On April 2nd we spoke to [M.L.]. She told us that they have known [appellant] since [the victim] was eight years old and that she knew him through church.

She indicated that she noticed [the victim] getting closer to [appellant] in the past few months and that he would come to the house to pick [the victim] up.

She indicated that [the victim] had recently begun to talk back to her. [M.L.] acknowledged that when [the victim] would talk back to her she would sometimes physically discipline [the victim] for talking back.

She indicated that she never gave permission for [appellant] to sign [the victim] out of school and that she had told [appellant] that she did not want [him] to see [the victim] any more.

Again, she said she dropped [the victim] off for school -- or for the bus at the bus stop on March 5th and [the victim] never came back from school.

To date, . . . I don't believe, since [the victim] has left, [M.L.] has had a chance to see [the victim] yet and I could only describe her mood as heartbroken about that.

I know the Court's expressed questions about the nature of the relationship between [appellant] and [the victim].

> All I can say is that [the victim] has denied any type of sexual relationship numerous times. [Appellant] has denied it. And while we certainly have our beliefs and suspicions we have no direct or forensic evidence to say otherwise.

Notes of testimony, 11/1/18 at 4-14. Following imposition of sentence, appellant filed a timely motion for reconsideration of sentence. The trial court denied the motion. Appellant filed a timely notice of appeal. The trial court ordered appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely complied. Subsequently, the trial court filed its Rule 1925(a) opinion wherein it relied on its January 2, 2019 opinion that set forth its reasons for denying appellant's motion for reconsideration of sentence.

Appellant raises the following issue for our review:

> Did the lower court abuse its discretion by imposing an unreasonable and excessive statutory maximum sentence for a Level 2 misdemeanor offense of corruption of minors by: (1) speculating that [appellant's] relationship with the 16-year-old [victim] was a sexual one and then using such a "finding" to enhance the sentence; (2) relying on insufficient, unproven reasons for exceeding all guideline ranges; (3) ignoring substantial mitigating evidence; (4) failing to consider [appellant's] rehabilitative needs; and (5) showing a biased determination to impose the maximum sentence possible?

Appellant's brief at 4.

Appellant challenges the discretionary aspects of his sentence.

> [T]he proper standard of review when considering whether to affirm the sentencing court's

determination is an abuse of discretion. . . . [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. In more expansive terms, our Court recently offered: An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.

***Commonwealth v. Moury***, 992 A.2d 162, 169-170 (Pa.Super. 2010)

(citation omitted; brackets in original).

Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. ***Commonwealth v. Sierra***, [752 A.2d 910, 912 (Pa.Super. 2000)]. An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

[W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from

> is not appropriate under the Sentencing
> Code, 42 Pa.C.S.A. § 9781(b).

***Moury***, 992 A.2d at 170 (citation omitted; brackets in original).

Here, appellant filed a timely notice of appeal, properly preserved his sentencing challenge in a post-sentence motion seeking reconsideration of sentence, and included in his brief the requisite Rule 2119(f) statement. Consequently, we must now determine whether appellant raises a substantial question.

We determine whether an appellant raises a substantial question on a case-by-case basis. ***Commonwealth v. Swope***, 123 A.3d 333, 338 (Pa.Super. 2015) (citation omitted). "A substantial question exists only when an appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Id.*** (citation omitted).

> In determining whether a substantial question exists, this Court does not examine the merits of whether the sentence is actually excessive. Rather, we look to whether the appellant has forwarded a plausible argument that the sentence, when it is within the guideline ranges, is clearly unreasonable. Concomitantly, the substantial question determination does not require the court to decide the merits of whether the sentence is clearly unreasonable.

***Id.*** at 340 (citation omitted).

Appellant claims that the trial court abused its discretion when it imposed an excessive sentence (1) after speculating that appellant's relationship with the victim was sexual; (2) after considering factors that have no record support; particularly, the victim's vulnerability and appellant's lack of remorse; (3) by ignoring mitigating evidence; (4) by failing to consider appellant's rehabilitative needs and the protection of the public; and (5) by demonstrating bias against appellant.  Appellant's claims raise substantial questions.  *See*, *e.g.*, *Commonwealth v. Simpson*, 829 A.2d 334, 338 (Pa.Super. 2003) (finding that "a claim that the sentence is excessive because the trial court relied on impermissible factors raises a substantial question"); *Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa.Super. 2014) (finding a substantial question was presented by an excessiveness claim combined with allegations that the trial court failed to consider mitigating factors); *Commonwealth v. Downing*, 990 A.2d 788, 793 (Pa.Super. 2010) (holding that a claim that the trial court failed to consider defendant's rehabilitative needs and the protection of society in fashioning sentence raises a substantial question); and *Commonwealth v. Corley*, 31 A.3d 293, 297 (Pa.Super. 2011) (finding that an allegation of bias in sentencing implicates the fundamental norms underlying sentencing and, therefore, raises a substantial question).

Appellant's first, second, and fifth claims are interrelated.  In those claims, appellant contends that the trial court considered impermissible

factors in the absence of record support and that those impermissible considerations resulted in bias against appellant at sentencing. As this court has stated, a "guilty plea does not prevent the sentencing court from making reasonable inferences based on [record] facts." *Commonwealth v. Druce*, 796 A.2d 321, 336 (Pa.Super. 2002).

Appellant first claims that the trial court "speculated [that the victim and appellant] had a sexual relationship and made that specific finding despite the lack of any record evidence to support such a conclusion." (Appellant's brief at 18.) At the sentencing hearing, the trial court stated that it believed that there was enough circumstantial evidence for it to find that appellant and the victim shared a sexual relationship. (Notes of testimony, 12/10/18 at 29.) The conclusion was reasonable in light of the record.

Although appellant focuses on the fact that he and the victim denied a sexual relationship, the trial court heard testimony from appellant's wife who stated that she was not comfortable with the relationship that appellant had with the victim and that it got "very weird." (*Id.* at 13.) Appellant's wife further testified that it "broke [her] heart" when she learned that appellant had been renting an apartment without her knowledge which explained to her why appellant always wanted to leave the marital residence. (*Id.*) Appellant admitted to secretly renting the apartment and being there with the victim. (*Id.* at 38.) Although appellant described himself as a "father figure" to the victim, he acknowledged that he shared a secret life with her in which he

signed her out of school, provided her with alcohol, took her out of the country, eluded law enforcement in an effort to remain with her, and stayed with her in a hotel room. (***Id.*** at 35, 38-39.)

At the sentencing hearing, the trial court admitted into evidence eight photographs that were taken from appellant's phone that depict appellant and the victim in Mexico. (***Id.*** at Commonwealth Exhibits 1-8). Our review of the photographs, as well as the transcripts of the guilty plea hearing and the sentencing hearing, compels the conclusion that the trial court reasonably inferred that appellant and the victim shared a sexual relationship.

Appellant next complains that the trial court impermissibly considered factors that have no record support; specifically, the victim's vulnerability. The record reflects that the trial court imposed a sentence outside of the guidelines range because, among other things, the "victim was particularly vulnerable due to her age." (***Id.*** at 43.) In his brief, appellant attempts to convince this court that the victim was a cunning 16-year-old girl who masterminded a plan to run away to Mexico and that the 45-year-old appellant merely tagged along. The United States Supreme Court has recognized "three key differences" between minors and adults in the context of juvenile punishment in ***Graham v. Florida***, 560 U.S. 48 (2010). Although the case before us does not concern juvenile punishment, we nevertheless find the "key differences" instructive. The High Court recognized that compared to adults, minors (1) have a "lack of maturity and an underdeveloped sense of

responsibility"; (2) are more vulnerable and susceptible to negative influences; and (3) have an underdeveloped character. *Id.* at 68. These "key differences" compel the conclusion that the trial court did not abuse its discretion in determining that the 16-year-old victim in this case was "particularly vulnerable due to her age." (Notes of testimony, 12/10/18 at 43.)

Appellant next claims that the trial court failed to provide additional details as to why appellant's offense gravity score was an "inadequate measure of the seriousness of the crime." (Appellant's brief at 22.) The record belies this claim. The trial court explained

> [appellant], this is more than just a mistake. Every day in court we accept circumstantial evidence as proof of certain things. There is an enormous amount of circumstantial evidence and direct evidence against you.
>
> You asked me to make some unreasonable leaps about what was happening with your relationship with [the victim] that I'm not willing to make.
>
> If you were a father figure to her one of the things you could have done was just let her go and then call the authorities. Get out of the airport, right? That was one of the choices.
>
> APPELLANT: Yeah.
>
> THE COURT: Why you didn't make that choice is because during these years as your contact with [the victim] increased, and increased, and increased, and your deceptions became more and more and the time you spent with her got greater and greater, you became obsessed and you didn't want her to go without you.

> You needed to be with her. That's why you left your family. That's why you destroyed two families. Two families.
>
> You were repeatedly told to stay away from her and you didn't. You just made criminal choices that expose you to the [maximum] sentence.

Notes of testimony, 12/10/18 at 42-43. Clearly, appellant's claim that the trial court failed to provide additional details as to the insufficiency of appellant's offense gravity score relative to the seriousness of the crime lacks record support.

Appellant's final claim with respect to his contention that the trial court relied on insufficient or unproven reasons for exceeding the guidelines range is that the trial court abused its discretion when it concluded that appellant lacked remorse because appellant "expressed remorse and accepted responsibility for what he admitted he did." (Appellant's brief at 22.) The trial court, however, concluded that appellant showed little remorse and failed to accept full responsibility. (Notes of testimony, 12/10/18 at 42-43.)

> In considering whether a sentence was manifestly excessive the appellate court must give great weight to the sentencing judge's discretion, as he or she is in the best position to measure various factors such as the nature of the crime, the defendant's character, and the defendant's display of remorse, defiance or indifference.

***Commonwealth v. Ellis***, 700 A.2d 948, 959 (Pa.Super. 1997) (citation omitted). Here, the trial court was in the best position to evaluate appellant's demeanor and display of remorse. We will not interfere with that evaluation.

Our review of the record demonstrates that appellant's claim that the trial court considered impermissible factors in the absence of record support in and of itself lacks record support. Therefore, because appellant's claim of bias is dependent on a finding that the trial court considered impermissible factors, the bias claim equally fails.

In his third claim, appellant contends that the trial court did not consider mitigating evidence. The record belies this claim. At the sentencing hearing, appellant's counsel informed the trial court of the mitigating evidence in appellant's favor. (Notes of testimony, 12/10/18 at 22-24.) Additionally, the trial court had the benefit of a pre-sentence investigation ("PSI") report. "[W]here the sentencing judge had the benefit of a [PSI] report, it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Clarke*, 70 A.3d 1281, 1287 (Pa.Super. 2013), *appeal denied*, 85 A.3d 481 (Pa. 2014), quoting *Commonwealth v. Bricker*, 41 A.3d 872, 876 n.9 (Pa.Super. 2012) (quotation and quotation marks omitted); *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988) ("It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand"). Therefore, this claim lacks merit.

In his final claim, appellant advances a boilerplate allegation that the trial court failed to consider his rehabilitative needs and the fact that he is not

a danger to the community. (Appellant's brief at 25-26.) Appellant's specific claim, however, is that the trial court improperly denied his request for a county sentence so he could participate in work-release and make amends to his children by financially supporting them. (***Id.***) Appellant claims, without citation to authority, that a "defendant's rehabilitation includes trying to make amends for his wrongdoing." (***Id***. at 26.) The record reflects that the trial court listened to appellant's argument advocating for a county sentence. (Notes of testimony, 12/10/18 at 33-34.) The fact that the trial court rejected the request, however, does not lead to the conclusion that the trial court failed to consider the request. Therefore, this claim warrants no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/23/19